UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CHRIS WILCOX,

                Petitioner,

v.

TONY TRIERWEILER,

                Respondent.

_____/

Case No. 1:16-cv-415

Honorable Robert J. Jonker

## **REPORT AND RECOMMENDATION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Chris Wilcox is incarcerated with the Michigan Department of Corrections at the Bellamy Creek Correctional Facility (IBC) in Ionia, Michigan.  On October 24, 2012, a Montcalm County Circuit Court jury found Petitioner guilty of owning or possessing a chemical or laboratory equipment that he knew or had reason to know would be used to manufacture methamphetamine in the presence of a minor, MICH. COMP. LAWS § 333.7401c(2)(b), and owning or possessing chemical or laboratory equipment that he knew or had reason to know would be used to manufacture methamphetamine, MICH. COMP. LAWS §§ 333.7401c(1)(b), 333.7401c(2)(a).  On January 17, 2013, the court imposed sentences of two prison terms of 12 to 30 years.

On January 26, 2018,[1] Petitioner filed his habeas corpus petition raising six grounds for relief, as follows:

_____

[1] Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).  For purposes of this Report and Recommendation, I have given Petitioner the benefit of the earliest possible filing date.  *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)).

I. THE [PETITIONER]'S CONVICTIONS SHOULD BE OVERTURNED BECAUSE THERE WAS INSUFFICIENT CREDIBLE EVIDENCE TO PROVE THE [PETITIONER] GUILTY OF THE CRIMES.

II. THE TRIAL COURT DENIED THE [PETITIONER] A FAIR TRIAL AND HIS DUE PROCESS RIGHTS BY[:]  NOT PROPERLY ASSURING EXPERT TESTIMONY AS REQUIRED BY LAW; ERRORS IN EVIDENTIARY RULINGS INCLUDING ALLOWING 404(B) TESTIMONY; AND INSTRUCTIONAL ERRORS.

III. THE PROSECUTOR'S ACTIONS DENIED THE [PETITIONER] A FAIR TRIAL AND HIS DUE PROCESS RIGHTS UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS.

IV. CONTRARY TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION [PETITIONER]'S CONVICTION WAS BASED UPON DEFECTIVE COMPLAINT AND INFORMATION WHICH THE STATE USED TO IMPROPERLY VEST DISTRICT COURT WITH JURISDICTION.

V. CONTRARY TO THE SIXTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION [PETITIONER] WAS DENIED A FAIR TRIAL WHERE HIS APPOINTED COUNSEL REPEATEDLY FAILED TO OBJECT TO THE ADMISSIBILITY OF HIGHLY PREJUDICIAL AND MISLEADING EVIDENCE, FAILED TO OBJECT TO THE CLEARLY IMPROPER JURY INSTRUCTION AND FAILED TO MOTION FOR A NEW TRIAL ON GROUNDS THAT THE VERDICT IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

VI. CONTRARY TO THE FOURTEENTH[] AMENDMENT OF THE UNITED STATES CONSTITUTION [PETITIONER] WAS DENIED A FAIR TRIAL WHERE LIEUTENANT RAU UNRESPONSIVELY TESTIFIED TO [PETITIONER] WILCOX BEING WANTED ON AN UNSPECIFIED CHARGE[].

(Pet., ECF No. 1, PageID.6, 8, 10, 13, 16.)  Respondent has filed an answer to the petition (ECF No. 7), stating that the grounds should be denied because they are procedurally defaulted, noncognizable and/or lack merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are either noncognizable or lack merit.  Accordingly, I recommend that the petition be denied.

2

**Discussion**

I.    Factual allegations

On November 14, 2011, Petitioner's wife called the police to complain about an unusual odor in the house.  When the officers responded, they recognized the smell of methamphetamine (meth) and they found items consistent with meth production.  Petitioner was charged with the two offenses on which he was ultimately convicted.  Following a preliminary examination held on July 10, 2012, Petitioner was bound over to the circuit court on both offenses. (Prelim. Exam. Tr. ECF No. 8-2, PageID.194-196.)  Prior to trial, the prosecutor filed a motion to admit evidence of other bad acts, specifically, evidence that Petitioner had used his stepson and his stepson's friend to purchase Sudafed on five different occasions.  (Register of Action, ECF No. 8-1, PageID.128.)  Following a hearing held on October 11, 2012, the court ruled that the evidence was admissible under Mich. R. Evid. 404(b).  The court further indicated that it would give a limiting instruction, if requested. (10/11/12 Mot. Hr'g Tr., ECF No. 8-4, PageID.216-219.) Defense counsel immediately requested a limiting instruction on the use of evidence of other bad acts.  (*Id.*, PageID.219-220.)

Approximately ten days before trial, the court heard arguments on Petitioner's motion to dismiss the case against Petitioner on the basis of prosecutorial misconduct.  Defense counsel argued that the prosecutor had threatened Petitioner's wife into testifying against her husband, by suggesting that if she did not testify, she would lose her children in the then-pending proceeding brought by Child Protective Services.  (10/12/12 Mot. to Dismiss Hr'g, ECF No. 8-5, PageID.225-228.)  The court indicated a willingness to rehear the matter, but opined that, even if the conversation occurred as Petitioner alleged, a fact disputed by the prosecutor, no misconduct occurred.  (*Id.*, PageID.233-236.)

3

On October 22, 2012, the afternoon before trial, the court conducted a hearing on Petitioner's motion to appoint new counsel.  (Mot. for New Att'y Tr., ECF No. 8-6, PageID.239-250.)  Petitioner contended that his second appointed attorney was not representing him as he would like.  He specifically complained that the second attorney had previously worked at the same law firm as the attorney he had replaced.  Petitioner also complained that defense counsel refused to subpoena certain Petitioner's witnesses.  (*Id.*, PageID.241.)  Defense counsel responded that Petitioner had identified a list of three witnesses for the first time a few minutes before the hearing.  According to defense counsel, he had met with Petitioner at least once a week, but Petitioner had never previously mentioned the witnesses, and the witnesses were not named elsewhere in the record.  In addition, defense counsel represented that, while previously appointed counsel had at one time worked at the same law firm as defense counsel, previously appointed counsel left that firm in 2006, and defense counsel himself left in 2008.  Defense counsel had had his own practice for four years as of the date of the hearing.  (*Id.*, PageID.241-243.)

Upon consideration, the trial court declined to appoint a third attorney to the case and advised Petitioner that no adjournment would be allowed, because the case had been twice adjourned already.  However, the court instructed the prosecutor to assist defense counsel in locating and subpoenaing the newly identified witnesses.  (*Id.*, PageID.246.)  Finally, defense counsel placed on the record the final plea offer made to Petitioner:  in exchange for reducing the charge to one count of attempted operating or maintaining a meth laboratory and an agreement to a sentence of 24 months to 10 years, the prosecutor would dismiss the other charges and the habitual-offender notice, which could have exposed Petitioner to possible life imprisonment.  (*Id.*, PageID.247-249.)  Petitioner rejected the plea offer on the record.  (*Id.*, PageID.248-249.)

Trial began on October 23, 2012.  Petitioner's wife, Robin Wilcox, testified that she had been married to her husband for almost three years.  On November 14, 2011, she, Petitioner, their daughter Chelsea (5), and Robin's two children, Jacob (19) and David (16), all lived in the home at 55 Amy School Road.  Robin's mother Pam also had lived with them for a time, but she had moved out a couple of months before November 14, 2011.  (T. Tr. I, ECF No. 8-7, PageID.332-334.)

A few days before November 14, 2011, Robin awoke to a strong smell resembling paint or paint thinner in her house, which gave her a headache.  Robin knew that Petitioner painted in the basement and had a work bench below the kitchen.  (*Id.*, PageID.334-335.)  The night before she smelled the strong odor, her husband had been in the basement with Denny Hickey.  She knew Denny Hickey as a loser and a druggie.  Knowing Hickey's reputation and smelling the odor, she became concerned for her family.  (*Id.*, PageID.336-337.)  Petitioner was in the basement with Hickey from 12:00 to 2:00 a.m.  (*Id.*, PageID.343.)  Petitioner left the house at some point that night, and he was gone for a couple of days.  (*Id.*, PageID.344.)  Robin did not immediately call the police upon waking to the smell.  A day or two later, she went downstairs and found a water bottle with a coffee filter in it.  (*Id.*, PageID.334-335.)  She became concerned, because she did not know what it was.  (*Id.*, PageID.335.)  Robin went to see the police on November 14, 2017, though she did not want to reveal to Petitioner that she was the source of the report.  (*Id.*, PageID.335-336, 376-377, 566.)  Robin Wilcox testified that, five or six months before the events, Petitioner had lost a lot of weight over the course of a month or two.  He also was sick, always angry, edgy, and stayed out until late at night.  (*Id.*, PageID.339, 374-375.)  She acknowledged that Jacob also had lost a lot of weight, but she knew that Jacob's weight loss was the result of a known heart problem.  (*Id.*, PageID.346.)  She suspected that Petitioner was on drugs.  (*Id.*,

5

PageID.340.)  She was particularly concerned because Petitioner was having Jacob buy Sudafed for him, and she thought it was for making meth.  (*Id.*, PageID.340, 346.)  According to Robin, the changes in Petitioner's behavior made her afraid of him and afraid of Hickey.  (*Id.*, PageID.375-376.)

When the police arrived at her home, Robin allowed them to search the house.  (*Id.*, PageID.345.)  After she called the police on November 14, 2011, she, her mother, David, and Chelsea all got tested for having been exposed to meth.  None of those tests came back positive. Robin admitted that she had smelled the horrible smell on other occasions, but she knew that Petitioner had been painting in the house.  (*Id.*, PageID.341.)  Once the police left the house, she spoke to Petitioner about what had happened.  She was crying and screaming, and she told Petitioner that they all were going to be tested.  Petitioner said something about having painted a candle stand for one of the fireplaces, but she knew that it had been painted before.  (*Id.*, PageID.342-343, 363.)

According to Robin, the basement had two entrances, one from inside the house and one from the outside patio.  She admitted that she did not go into the basement often and that the outside basement door was kept unlocked.  (*Id.*, PageID.350.)

On November 11, 2011, Michigan State Police Detective Lieutenant Steven Rau served as the team commander of the Central Michigan Enforcement Team (CMET), a 13-county narcotics task force.  (*Id.*, PageID.380.)  Rau also served as the District Meth Coordinator.  Rau was certified as an expert in how meth is produced and in recognizing the different methods, ingredients, equipment, and components of meth production.  (*Id.*, PageID.381-383.) Rau testified that two other officers, Deputies Don Wittkopp and Jason Coon initially responded to the house to search for Petitioner, who was the subject of a warrant.  During their search of the house, they

smelled a strong odor and found some items they believed related to the production of meth.  Rau was asked to assist them.  (*Id.*, PageID.383-384.)  When he arrived, Rau detected a strong solvent odor similar to xylene, a smell he associated with meth labs he had visited.  (*Id.*, PageID.385, 401.) He went into the basement, where he found the smell to be strong and fresh, which likely would have continued 24 to 48 hours after indoor production of the substance.  In the basement, Rau looked at a work bench on his right and noticed a clear water bottle, inside of which was a cloudy substance and a coffee filter.  (*Id.*, PageID.385.)  Rau also observed two 32-ounce cans of xylene, some quarter-inch plastic tubing, coffee filters, and a cold pack, all located together on a shelving unit.  (*Id.*, PageID.386.)  Immediately below those items, Rau found muriatic acid and glass jars. (*Id.*, PageID.390.)  Rau identified the items in picture-exhibits presented by the prosecution.  (*Id.*, PageID.389-390.)  While the products individually were available from many stores, seeing all of the items together made Rau believe that they had found a meth lab.  (*Id.*, PageID.391, 393.)  Rau saw no sign of someone having recently painted something in the area.  (*Id.*, PageID.401.)

Rau explained that the one-pot method of manufacturing meth involved crushing or grinding Sudafed and straining it through a coffee filter with alcohol or another solvent.  The liquid that comes through the filter contains the ephedrine, while the binder is left in the coffee filter.  The ephedrine liquid is placed in a Gatorade or pop bottle.  Lithium extracted from lithium batteries is placed in the liquid, together with another solvent, to which sodium hydroxide (lye) is added to form an oil layer that is the methamphetamine base.  Using either a turkey baster or another coffee filter, meth manufacturers strain the oil into a separate container.  At that point, they create a hydrogen chloride gas generator by inserting a plastic hose into a Gatorade bottle, sealing it, and then adding muriatic acid or sulfuric acid with salt to create hydrogen chloride gas, which is in turn bubbled through the oil methamphetamine base to create a crystal.  (*Id.*, PageID.392,

394-395.)  Rau testified that he initially thought the water bottle and coffee filter were from either tablet extraction or from soaking the filter containing pill binder in water or pop to release the remaining ephedrine from the residue, in order to make a drink that gives an energy boost.  (*Id.*, PageID.395.)  Rau testified that meth is a stimulant, causing abusers to remain awake for days at a time, before crashing and sleeping for extended periods, after which they begin the process again. Users typically experience erratic behavior and drastic weight loss.  (*Id.*, PageID.399-400.)

On cross-examination, Rau acknowledged that he found no lye or lithium batteries, which were essential to meth production by the one-pot method.  (*Id.*, PageID.405.)  Rau indicated, however, that meth cooks often burned opened batteries and cold packs.  (*Id.*, PageID. 407.)  He also admitted that it was possible that the bottle containing the ephedrine-liquid had been brought to the house after being manufactured somewhere else.  (*Id.*, PageID.405-406.)  However, in such a case, he would not have expected to smell a strong solvent odor.  (*Id.*, PageID.411.)

Montcalm County Deputy Sheriff Don Wittkopp was assigned to the CMET team on November 14, 2011.  He was one of the first officers to respond to Robin Wilcox's call, and he was the investigating officer on the case.  (*Id.*, PageID.414.)  He oversaw the collection of evidence, including the water bottle containing the filter, the tubing, and a separate bottle containing a sample of the liquid from the water bottle, which Wittkopp saw Detective Rau draw from the larger bottle.  The evidence was placed into temporary evidence bags that Wittkopp sealed and initialed.  (*Id.*, PageID.415, 419, 424-425.)  The evidence was sent to the crime lab to check for fingerprints and the presence of a controlled substance.  (*Id.*, PageID.425-426.)

Michigan State Police Forensic Scientist Susan Isley testified that she had worked at the Grand Rapids crime lab for 19 years.  (*Id.*, PageID.427.)  Isley was qualified as an expert in drug chemistry and meth production and ingredients.  (*Id.*, PageID.429.)  Isley determined that the

sample bottle of cloudy liquid extracted from the water bottle contained pseudoephedrine.  (*Id.*, PageID.432-433.)  She also tested the residue on the plastic tubing, but she did not find any controlled substance on it.  (*Id.*, PageID.433.)  Isley was not surprised by the absence of a controlled substance on the tubing, as she typically found something on tubing only 50% of the time.  (*Id.*, PageID.433-434.)  She noted that, when tubing is used in meth production, it is used for a hydrochloride gas generator, so it does not necessarily touch the controlled substance.  (*Id.*, PageID.441.)  Isley was not asked to check for latent fingerprints on the water bottle, and she did not do so.  (*Id.*, PageID.441-442.)

Michigan State Police Sergeant Shawn Baker testified as a latent fingerprint examiner.  (*Id.*, PageID.445.)  Because many reasons exist for fingerprints not to be present on a surface, he finds fingerprints in only about 20 percent of the cases he works.  (*Id.*, PageID.447.)  On the Smart water bottle he processed in the instant case, because he saw no visual prints, he used the superglue method in an attempt to recover prints.  (*Id.*, PageID.449.)  He could see that the item had been touched, but he lacked sufficient portions of the print to allow a comparison or identification.  (*Id.*, PageID.450.)

Jacob VanDyke, Robin Wilcox's son, testified that on November 14, 2011, he was living at his grandmother's (Pam Schaub's) home, though between July and November, he had moved home for some time and then back to his grandmother's.  (*Id.*, PageID.454-455.)  His brother David and his half-sister Chelsea lived with his mother and step-father (Petitioner).  (*Id.*, PageID.455.)  Between July and October, Petitioner asked VanDyke to buy Sudafed for him on five occasions.  (*Id.*, PageID.457.)  The first time, Petitioner asked VanDyke to go to the store with him.  On the way to the store, Petitioner told VanDyke that he needed VanDyke to buy him Sudafed.  VanDyke did not ask why, but he testified that Petitioner did not have a valid driver's

license.  (*Id.*, PageID.456-457.)  According to VanDyke, Petitioner generally brought him to the store and brought him back home.  Petitioner paid for the Sudafed and paid VanDyke an additional five dollars.  (*Id.*, PageID.458-459.)  One time, VanDyke's friend Raymond Bush was with him, and Petitioner asked Bush to buy Sudafed, too.  (*Id.*, PageID.459.)  On the one occasion VanDyke met Petitioner at the store, Petitioner was with his friend Denny.  (*Id.*, PageID.460.)  VanDyke identified exhibits showing his signatures for the purchases.  (*Id.*, PageID.457-458.)  VanDyke testified that he did not know why Petitioner wanted him to buy Sudafed, though he assumed that it was because Petitioner did not have a valid identification.  (*Id.*, PageID.462.)  The last time he bought Sudafed, however, he told his grandmother that he was buying Sudafed for Petitioner, and she got mad.  After that, he never bought Sudafed for Petitioner again.  (*Id.*, PageID.461.)  During the three months leading up to November 2011, VanDyke noticed that Petitioner had a change in behavior, becoming angry easily, throwing things, and leaving for long periods of time.  (*Id.*, PageID.469.)  VanDyke testified that he and his brother went to the basement to work on their bikes, but he only went into Petitioner's area of the basement occasionally, in order to get a tool.  (*Id.*, PageID.471.)  VanDyke, his mother, and his brother went into the basement on November 14, 2011, because of the strong paint-thinner type of smell.  They saw the bottle, and his brother opened it and sniffed it.  (*Id.*, PageID.475-476.)  VanDyke testified that he had tried smoking incense at 16, but doing so had damaged his heart.  He therefore did not use drugs and he drank only occasionally.  (*Id.*, PageID.467-468, 483-484.)

Raymond Bush testified that he had only seen Petitioner one time, but was a friend of Jacob VanDyke.  Bush was with Jacob VanDyke when he met Petitioner.  (*Id.*, PageID.495-496.)  Petitioner asked them to buy Sudafed, and they both did, going to two different Meijer stores.  (*Id.*, PageID.487-498.)  Petitioner showed up after they bought the Sudafed, and they went

out to the parking lot to give the packages to Petitioner.  At that time, Petitioner was with another male, but Bush never knew the man's name.  (*Id.*, PageID.498-499.)  Bush testified that he did not use drugs or drink.  He stated that, as part of his employment he was drug tested.  He had never tested positive for drugs.  (*Id.*, PageID.501, 505.)

David VanDyke, Robin Wilcox's younger son, was 16 at the time of trial.  David stated that he and friends frequently were in the bicycle-repair area of the basement.  Another section of the basement was Petitioner's area, and it had a work bench and some shelving.  (*Id.*, PageID.507-509.)  David would occasionally go into Petitioner's part of the basement to grab a tool.  (*Id.*, PageID.510.)  David remembered when the police came to the house in November 2011.  He had to get drug tested after that, and everyone tested negative for drugs.  On November 14, 2011, he smelled an odor like paint thinner in the house, though he did not think it was very strong.  He followed his mother downstairs as she looked around.  David saw a bottle on the work bench, and he opened the cap and smelled it.  He did not smell anything.  (*Id.*, PageID.512-514.)  David did not notice any changes to Petitioner's behavior in the month preceding the police visit.  (*Id.*, PageID.512.)

Detective Don Wittkopp retook the stand to testify that, when Robin Wilcox called the police, she gave essentially the same story as her testimony at trial.  She stated that she had a suspicion that her husband was manufacturing meth.  She advised that she was very afraid of him, because his behavior had changed over the last few months.  Robin also reported that Petitioner had gotten her son Jacob VanDyke to purchase Sudafed, which Wittkopp immediately confirmed through the national log.  (*Id.*, PageID.523-524.)  She also reported that, the day before, she had smelled a strong odor in the house that immediately gave her a headache.  (*Id.*, PageID.525, 543.)  She also indicated that she had found a bottle containing what looked like a cloudy liquid with a

coffee filter inside.  When Wittkopp arrived, he obtained permission to search, and he found cans of solvents, the reported water bottle, a cold pack, and some tubing.  Based on his experience on the narcotics team, he recognized the elements of meth manufacture.  He also recognized the chemical smell in the house.  (*Id.*, PageID.525-526.)  Based upon his suspicions, he called Lieutenant Rau to the scene.  Wittkopp also seized the water bottle.  (*Id.*, PageID.525.)  Petitioner was not home at the time of the search.  Wittkopp interviewed Petitioner on June 28, 2012, after advising him of his rights to remain silent and to have an attorney.  Petitioner indicated that he would talk to Wittkopp.  Almost immediately, Petitioner told Wittkopp that the materials in the house were not his and that he did not make meth.  (*Id.*, PageID.528, 546.)  Petitioner stated that he knew how the materials got in his house and could identify the owner of the materials, who, he said, was the biggest "cook" (methamphetamine manufacturer) in the area.  (*Id.*, PageID.528-530, 552.)  Petitioner said that he was sleeping when the items were placed in the basement, but that he could tell Wittkopp who put them there.  (*Id.*, PageID.531.)  In addition, Petitioner admitted that he had been smoking meth for about a year.  (*Id.*, PageID.532.)  Petitioner suggested that he wanted something in exchange for giving up further information.  (*Id.*, PageID.537.)  Immediately following Wittkopp's testimony, the trial court gave a lengthy cautionary instruction, advising that the detective's opinion could not serve as evidence of guilt, instructing on how to evaluate the officer's testimony about Petitioner's statements; and advising that the officer's testimony about Robin Wilcox's prior statements could not be used as substantive evidence of guilt, but only to determine the credibility of her trial testimony.  (*Id.*, PageID.558-560.)

The prosecution rested.  (*Id.*, PageID.560.)  Defense counsel indicated outside the presence of the jury that he intended to briefly recall Robin Wilcox, but that Petitioner had, with advice and due consideration, elected not to testify.  (*Id.*)  Robin Wilcox testified that, after the

police left her house, she called Petitioner to advise him that the search had occurred, and she told Petitioner what was seized by the police.  (*Id.*, PageID.567.)  She also testified that one of David's friends, John Friedlin, had lived in their house for three months, from July to October, but Friedlin no longer lived in the house at the time of the events in issue.  (*Id.*, PageID.569-570.)  In October, Robin learned that Friedlin had stolen some of her mother's prescription medications from the house, and they were found in his school locker.  (*Id.*, PageID.574-576.)

Following closing arguments and jury instructions, the jury returned a verdict in one and one-half hours, including the time for ordering and eating lunch.  (T. Tr. II, ECF No. 8-8, PageID.652.)  The jury found Petitioner guilty on both offenses.  (*Id.*, PageID.653.)  After the jury was excused, the court recognized that, with the charging information, the prosecutor had filed a fourth-habitual offender notice.  The court expressed its intent to enter those prior convictions for sentencing purposes.  (*Id.*, PageID.655.)

On January 17, 2013, the date of sentencing, Robin Wilcox for the first time questioned whether Petitioner was in his right mind at the time he refused the plea offer and chose a jury.  Responding to skeptical questioning from the court, Robin indicated that she did not have an opportunity to raise the issue earlier, as she did not realize that she could tell the court such things during her testimony.  (*Id.*, PageID.662-663.)  The probation officer also located a letter that Robin Wilcox had sent to the wrong judge, which had ended up in the probation file.  In that letter, Robin Wilcox expressed her belief that drug use had affected her husband's brain and affected his choice not to take the guilty plea.  The letter also indicated that Robin Wilcox believed that the water bottle found in the basement belonged to Denny Hickey.  (*Id.*, PageID.664-665.)  Robin stated that she believed that Petitioner should get help with his drug addiction and that, while Petitioner should be punished, he should not serve a long sentence.  She spoke about

Petitioner having been in foster care as a child and having experienced verbal and physical abuse. She also stated that, prior to his drug problem, Petitioner had been a good husband and father.  (*Id.*, PageID.665-666.)  Defense counsel strenuously urged a lower sentence than the 12-year minimum recommended in the presentence report.  The court, stating its reasons, sentenced Petitioner to two terms of 12 to 30 years' imprisonment, to run concurrently, and ordered 203 days' credit for time served.  (*Id.*, PageID.672-673.)

Petitioner appealed his convictions and sentences to the Michigan Court of Appeals, raising the same six grounds presented in his habeas petition.  In a lengthy unpublished opinion issued on June 19, 2014, the court of appeals rejected all appellate grounds and affirmed the convictions.  (Mich. Ct. App. Op., ECF No. 8-10, PageID.676-686.)  Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same six issues presented to the Michigan Court of Appeals.  (Def.-Appellant's Appl. for Leave to Appeal, ECF No. 8-11, PageID.892-897.)

II.    AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.    Ground I:  Sufficiency of the Evidence

In his first ground for relief, Petitioner argues that the prosecutor presented insufficient credible evidence to prove Petitioner guilty of the charges. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  Moreover, because both

the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at

two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as

contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's]

consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d

525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on

sufficiency-of-the-evidence grounds.  *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710

(7th Cir. 2009)).

> The Michigan Court of Appeals considered and thoroughly addressed the issue, as

follows:

> Defendant first challenges the sufficiency of the evidence supporting his
> convictions. We review the sufficiency of the evidence de novo.  *People v Lueth*,
> 253 Mich App 670, 680; 660 NW2d 322 (2002).  "[W]hen determining whether
> sufficient evidence has been presented to sustain a conviction, a court must view
> the evidence in a light most favorable to the prosecution and determine whether any
> rational trier of fact could have found that the essential elements of the crime were
> proven beyond a reasonable doubt."  *People v Wolfe*, 440 Mich 508, 515; 489
> NW2d 748 (1992), amended 441 Mich 1201 (1992).  "Circumstantial evidence and
> reasonable inferences arising therefrom may be sufficient to prove all the elements
> of an offense beyond a reasonable doubt."  *People v Harrison*, 283 Mich App 374,
> 378; 768 NW2d 98 (2009).[1]  On appeal, defendant mistakenly contends that,
> because the prosecution's case relied heavily on circumstantial evidence, he could
> only be convicted if an inference of criminality arose from the circumstantial
> evidence with "impelling certainty."  Contrary to defendant's arguments on appeal,
> it is not the role of this Court to reevaluate the credibility of the evidence in order
> to ascertain whether the prosecution presented enough "credible" evidence to
> support defendant's convictions.  *See Wolfe*, 440 Mich at 515.  Rather, "[t]he
> credibility of witnesses and the weight accorded to evidence are questions for the
> jury, and any conflict in the evidence must be resolved in the prosecutor's favor."
> *Harrison*, 283 Mich App at 378.

> Viewing the evidence in a light most favorable to the prosecution, we
> conclude that there was sufficient evidence to support defendant's convictions.  In
> particular, pursuant to MCL 333.7401c(1)(b), it is a criminal act for a person to

(1) own or possess, (2) any chemical or any laboratory equipment, (3) that the person knows or has reason to know is to be used for the purpose of manufacturing methamphetamine. See also MCL 333.7214(c)(*ii*).   In this case, by his own admission, defendant had been using methamphetamine for several months, and there was evidence that he had repeatedly paid his stepson to purchase Sudafed for him during that time.  One evening in November of 2011, defendant spent several hours late at night in his basement with a friend before leaving the home in the middle of the night.  When his wife awoke the following morning she smelled an "unusual" odor in the home, reminiscent of paint or paint thinner.   Upon investigating the basement the following day, defendant's wife discovered a water bottle containing a cloudy substance and a coffee filter, prompting her to notify the police.  Responding police officers familiar with methamphetamine laboratories identified the unusual smell in the home as indicative of methamphetamine manufacturing, tests on the water bottle revealed the presence of pseudoephedrine, and the coffee filter was consistent with the pseudoephedrine extraction phase of manufacturing methamphetamine.  Defendant's workbench area in the basement contained numerous additional items for the production of methamphetamine, including cans of Xylene, rubber or plastic tubing, coffee filters, and an ammonia nitrate cold pack, muriatic acid, and glass jars.  Taken together, this evidence provided sufficient support for defendant's conviction pursuant to MCL 333.7401c(1)(b).

Further, according to MCL 333.7401c(2)(b), heightened penalties apply for violation of MCL 333.7401c(1)(b) when "the violation is committed in the presence of a minor."  A "minor" refers to an individual under the age of 18. MCL 333.7401c(7)(d). In defendant's case, there was sufficient evidence to establish that his violation of MCL 333.7401c(1)(b) occurred in the presence of his five-year-old daughter who resided in the home where he kept his methamphetamine materials and who was home during the time the materials were in the basement, including times when the noxious smell permeated the home.[2]  In sum, there was sufficient evidence for a rational trier of fact to find defendant guilty of his two convictions beyond a reasonable doubt.

[1] This is not the law in Michigan.  Instead, our review is the same whether the evidence is direct or circumstantial, *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000), and the prosecution could rely on circumstantial evidence without the necessity of proving its case with "impelling certainty" or disproving every reasonable theory consistent with defendant's innocence.  See *id.*; *People v Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010).

[2] Contrary to defendant's arguments, the prosecution was not required to show that defendant intended to manufacture methamphetamine in the minor's presence; it was enough that the minor was present while defendant possessed the items which he knew or should have known were to be used for production.  See MCL 333.7401c(1)(b); MCL 333.7401c(2)(b).

(Mich. Ct. App. Op., ECF No. 8-10, PageID.676-677.)  The Michigan Court of Appeals squarely

applied the *Jackson* standard in analyzing Petitioner's sufficiency claim.  Not only does the recited

standard track *Jackson* analytically, but also the court of appeals relied on *People v. Wolfe*, 489 N.W.2d 748 (Mich. 1992), which expressly discusses and applies *Jackson*. *Id.* at 751.

Moreover, the court of appeals' application of the standard was patently reasonable, both factually and legally. The court's recitation of the facts supporting the claim is completely consistent with this Court's summary of the evidence adduced at trial. Those facts amply supported every element of the offenses, as outlined by the court of appeals. The court of appeals also rejected Petitioner's suggestion that circumstantial evidence is inherently suspect and should be weighed differently than direct evidence under Michigan law. (Mich. Ct. App. Op., ECF No. 8-10, PageID.676-677 (citing *Nowack*, 614 N.W.2d at 81)). It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Further, the court of appeals squarely rejected Petitioner's argument about what constitutes the presence of a minor under Michigan law. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Considering the evidence presented at trial in the light most favorable to the prosecution and applying those facts to the law as established by the court of appeals, the evidence was sufficient to support Petitioner's conviction on both offenses. Petitioner utterly fails to overcome the double deference owed to the state courts' denials of his claim. As a consequence, he is not entitled to relief on his first habeas ground.

IV.    Ground II:  Denial of a Fair Trial

In his second habeas ground, Petitioner makes a variety of arguments about how the trial court denied him due process and a fair trial. First, he contends that the trial court impermissibly allowed two officers to testify as experts that the presence of Xylene, plastic tubing, coffee filters, an unopened cold pack, and muriatic acid were indicative of meth production. He

19

also argues that the trial court denied him due process by allowing the admission of evidence of other bad acts, specifically evidence that Petitioner had solicited his stepson and the stepson's friend to purchase Sudafed for Petitioner.  Finally, Petitioner argues that he was denied due process when the trial court improperly instructed the jury concerning the issue of whether minors were "present" within the meaning of MICH. COMP. LAWS § 333.7401c(2)(b).

The court of appeals denied Petitioner's claims, in part on the basis that his claims were procedurally barred because he had failed to object or had waived his objections to the officers' testimony.  "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 340 (2010).  Nevertheless, the United States Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Because Petitioner argues that counsel was ineffective in failing to raise the proper objections, the procedural default issue raises more questions than the case on the merits.  The Court therefore will skip the question of procedural default and proceed to the merits of his claims. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

A.      Opinion testimony of experts

Petitioner argues that certain opinion testimony offered by Lieutenant Rau and Deputy Wittkopp was improperly admitted into evidence.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  Petitioner has not met this difficult standard.

The Michigan Court of Appeals thoroughly addressed Petitioner's complaints about the admission of the testimony of Lieutenant Rau and Deputy Wittkopp concerning the ingredients and equipment required to produce methamphetamine:

Defendant also asserts on appeal that the trial court violated his due process right to a fair trial in several ways.[3] In particular, defendant first contends that the trial court violated due process by admitting the opinion testimony of two police officers related to whether the items discovered in the basement were indicative of a methamphetamine laboratory without first assessing the admissibility of the testimony under MRE 702. Relevant to defendant's argument, MRE 702 establishes the prerequisites for the admission of expert testimony involving "scientific, technical, or other specialized knowledge." A court considering the admission of testimony under MRE 702 acts as a gatekeeper, and in this capacity must ensure that "the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012).

In this regard, one of the police officers, Lieutenant Steven Rau, was qualified as an expert by the trial court in matters of "how Meth is made, recognizing the different methods, the ingredients, equipment and components related." Defendant not only failed to object to the introduction of Lieutenant Rau's testimony as an expert regarding these issues, he affirmatively abandoned any such claim when his counsel expressly stated that he had "no objection" to the officer's qualification as an expert in this area. See *People v Kowalski*, 489 Mich 488, 504-505; 803 NW2d 200 (2011). See also *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004) ("[A] party may waive any claim of error [under MRE 702] by failing to call this gatekeeping obligation to the court's attention . . . ."). Having waived any error in relation to the introduction of Lieutenant Rau's expert opinion on this topic, defendant cannot now complain that admission of Lieutenant Rau's testimony within his area of expertise violated MRE 702. And, indeed, Lieutenant Rau appeared eminently qualified to offer opinions on the topic given his substantial training and experience in investigating methamphetamine laboratories, including training at the U.S. Drug Enforcement Agency's Clandestine Laboratory School, and his experience investigating such laboratories in his role as the District Meth Coordinator for the Central Michigan Enforcement Team. We discern no error in the admission of his opinion.[4]

The second police officer to whose opinion testimony defendant now objects was Deputy Sheriff Donald Wittkopp. Defendant failed to object to Deputy Wittkopp's opinion testimony at trial. Accordingly, defendant's arguments are unpreserved and reviewed for plain error affecting his substantial rights. *Carines*, 460 Mich at 763-764. Contrary to defendant's arguments, the trial court did not

need to consider the admissibility of Deputy Wittkopp's testimony pursuant to MRE 702 because Deputy Wittkopp offered his opinion as lay witness, subject to MRE 701.  See *People v Petri*, 279 Mich App 407, 416; 760 NW2d 882 (2008) (recognizing that a lay witness need not be qualified under MRE 702).  Under MRE 701, a lay witness may offer opinions or inferences "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  For example, police officers may offer lay opinions under MRE 701 that are rationally based on their perceptions and experiences, provided those opinions are not overly dependent on scientific, technical, or other specialized knowledge.  See, e.g., *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994); *People v Oliver*, 170 Mich App 38, 50; 427 NW2d 898 (1988), mod 433 Mich 862 (1989).  In this case, Deputy Wittkopp, who had some past experience with other methamphetamine sites, opined that the proximity of the items gathered together in the basement was an indication that they were components of a methamphetamine laboratory.  He did not, however, claim that his opinion was supported by any specialized, technical, or scientific knowledge.  Because his testimony was rationally based on his perceptions of the items in the basement, and helpful to a clear understanding of his testimony and the determination of facts at issue, it was admissible pursuant to MRE 701.

[3] Although defendant attempts to frame these issues as constitutional matters, not all errors are constitutional in nature, *People v Blackmon*, 280 Mich App 253, 260; 761 NW2d 172 (2008), and we see no constitutional error in the admission of the evidence at issue.

[4] Relying on MRE 702, defendant also challenges Lieutenant Rau's testimony on the characteristics of a methamphetamine user, an area in which Lieutenant Rau was not specifically qualified as an expert by the trial court. Any challenge to this testimony by defendant is unpreserved and reviewed for plain error. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Considering Lieutenant Rau's area of expertise, it seems apparent from the record that he would be qualified to describe basic behaviors of a typical methamphetamine user, and admission of his testimony on this topic was not plain error. Moreover, even assuming some error occurred, reversal is not required because Lieutenant Rau's testimony—offered to demonstrate defendant's behaviors were consistent with methamphetamine use—was cumulative of defendant's own admission that he had been using methamphetamine. Defendant has not shown that the admission of this cumulative evidence affected the outcome of the trial. See *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

(Mich. Ct. App. Op., ECF No. 8-10, PageID.679-680.)  Although the state court concluded that

Petitioner had not properly objected or had waived his objection to the admission of the officers'

testimony, the court also squarely concluded that the evidence of both witnesses was proper under

Michigan law.  That determination is not reviewable here.  The Sixth Circuit repeatedly has

recognized "'that a state court's interpretation of state law, including one announced on direct

23

appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

Moreover, no United States Supreme Court precedent bars the admission of the officers' testimony on constitutional grounds.  Petitioner relies, as he did in the state courts, on the Supreme Court's decision in *Daubert v. Merrill Pharmaceutical, Inc.*, 509 U.S. 579 (1993), for the proposition that a federal court, in admitting expert evidence under Federal Rules of Evidence 702, acts as a gatekeeper and may not admit scientific or technical evidence unless it is both relevant and reliable.  *Id.* at 590-592.  *Daubert*, however, did not rest on constitutional grounds, but instead was an interpretation of the rules of evidence.  As a consequence, any alleged discrepancy between *Daubert* and the state application of its own evidentiary rules does not warrant habeas relief.  Under these circumstances, Petitioner fails to show that admission of the officers' testimony overcame "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Seymour*, 224 F.3d at 552.

B.    Other bad acts

Petitioner next complains that the trial court improperly admitted evidence that Petitioner solicited his stepson and his stepson's friend to buy Sudafed on prior occasions.  The court of appeals found that the evidence was properly admitted as part of the res gestae of Petitioner's activities and was also properly admitted under Michigan Rule of Evidence 404(b), because it had a tendency to show that Petitioner was the owner and possessor of the methamphetamine found in the work area of his basement.  Petitioner asserts that he was deprived of due process by the admission of the evidence of other bad acts.

There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts

24

evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior bad acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.

Because there was no constitutional violation in the admission of other-acts evidence, the state court decision was "far from" an unreasonable determination of the facts in light of the evidence presented.  *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh*, 329 F.3d at 512.  Petitioner therefore is not entitled to habeas relief because of the admission of the other acts evidence.

### C.    "Presence of a minor"

Petitioner argues that the trial court improperly instructed the jury in regard to the word "presence" as it appears in MICH. COMP. LAWS § 333.7401c(2)(b), which imposes a harsher sentence for the manufacture of a controlled substance when it is "committed in the presence of a minor."  Petitioner argues that the statute should apply only if the methamphetamine production occurred in the immediate vicinity of the minor, as opposed to in the house, structure, or area where the items were present, as instructed by the trial court.

The Michigan Court of Appeals rejected the claim:

Defendant's final due process argument relates to his assertion that the trial court improperly instructed the jury in regard to the meaning of the term "presence" as used in MCL 333.7401c(2)(b).  At trial, defendant objected to the court's instruction on "presence," arguing that it did not accord with the plain meaning of the term. To the extent defendant now challenges the trial court's instruction on this basis, his argument is preserved.  See *People v Fletcher*, 260 Mich App 531, 558; 679 NW2d 127 (2004).  Our review of instructional error is de novo. *McGhee*, 268 Mich App at 606.  The trial court is charged with clearly instructing the jury on the case and applicable law, including instructions on the elements, material issues, defenses, and theories.  *Id.*  However, we review instructions in their entirety, and "an imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights."  *Kowalski*, 489 Mich at 501-502.

In this case, the term "presence" relates to the heightened penalties imposed by MCL 333.7401c(2)(b) when violation of MCL 333.7401c(1)(b) "is committed in the presence of a minor."  Understanding what "presence" means in this context requires statutory interpretation.  When interpreting statutes, our primary goal is to discern and give effect to the Legislature's intent. *People v Morey*, 461 Mich 325, 329-330; 603 NW2d 250 (1999).  To ascertain the Legislature's intent, we begin with review of the words in the statute, affording undefined terms their plain and ordinary meaning. *People v Thompson*, 477 Mich 146, 151; 730 NW2d 708 (2007).  A dictionary may be consulted to determine the meaning of a term. *People v Lewis*, 302 Mich App 338, 342; 839 NW2d 37 (2013). Words must also be interpreted on the basis of the context in which they are used. *People v Flick*, 487 Mich 1, 11; 790 NW2d 295 (2010).  When, as in this case, we interpret the Public Health Code, MCL 333.1101 *et seq*., we are mindful that its provisions "shall be liberally construed for the protection of the health, safety, and welfare of the people of this state." MCL 333.1111(2).

The word "presence" is not defined in the statute at issue. Considering dictionary definitions, the term "presence" generally refers to "the state or fact of being present," or "immediate vicinity; proximity." *Random House Webster's College Dictionary* (1992).  In turn, the word "present" denotes "being with one or others or in the specified or understood place." *Random House Webster's College Dictionary* (1992).  In short, "presence" may be defined as the state or fact of being in a specified or understood place, or immediate vicinity or proximity. See also Black's Law Dictionary (9th ed. 2009) (defining "presence" as "[t]he state or fact of being in a particular place and time" or a "close physical proximity coupled with awareness").

At trial, the trial court instructed the jury that the phrase "in the presence of a minor" "means that the minor was present in the building, structure, place or area at the time the defendant owned or possessed the chemical or laboratory equipment, and that the defendant knew a minor was present."  Considering the meaning of the term "presence" as used in MCL 333.7401c(2)(b), we are persuaded that the

instruction given by the trial court fairly presented the issues to be tried and adequately protected defendant's rights.   That is, contrary to defendant's arguments, the plain meaning of the term "presence" is not narrowly limited to the minor's "immediate vicinity."  Rather, as the trial court recognized, it also refers to being in a specified place, in this case the house, structure, place or area where the methamphetamine related items were discovered.  The trial court's instruction thus comported with the plain meaning of the term "presence" and fairly presented the issues to be tried.  There was no error.

On appeal, defendant raises additional, unpreserved arguments regarding the trial court's definition of presence. Because these arguments are unpreserved, our review is for plain error.  *Carines*, 460 Mich at 763-764.  In particular, defendant argues that the trial court's challenged jury instruction violated the rule of lenity. "The 'rule of lenity' provides that courts should mitigate punishment when the punishment in a criminal statute is unclear." *People v Denio*, 454 Mich 691, 699; 564 NW2d 13 (1997). The statute at issue in this case is not unclear and, in any event, the rule of lenity does not apply to the interpretation of the Public Health Code which must, as noted, be "liberally construed for the protection of the health, safety, and welfare of the people of this state." *People v Johnson*, 302 Mich App 450, 462; 838 NW2d 889 (2013). Further, we reject defendant's contention that the trial court's jury instruction violated the separation of powers doctrine. As discussed, the trial court's instruction comported with the plain meaning of the statute, thereby effectuating the Legislature's intent. See generally *Thompson*, 477 Mich at 151. Defendant has not shown plain error in relation to these unpreserved claims of instructional error.

(Mich. Ct. App. Op., ECF No. 8-10, PageID.682-683.)

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process.  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *see also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

To the extent that Petitioner argues that the instruction was erroneous as a matter of state law, he fails to raise a cognizable habeas issue.  The state court, interpreting state law,

rejected Petitioner's reading of the statute.  As previously discussed, a state court's interpretation

of state law, including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus.'"  *Stumpf*, 722 F.3d at 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*,

546 U.S. at 76).

 The Supreme Court has discussed the varying manifestations of the due process

right to fair warning of criminal responsibility, including the rule of lenity:

> There are three related manifestations of the fair warning requirement.
> First, the vagueness doctrine bars enforcement of "a statute which either forbids or
> requires the doing of an act in terms so vague that men of common intelligence
> must necessarily guess at its meaning and differ as to its application." *Connally v.*
> *General Constr. Co.*, 269 U.S. 385, 391 (1926); *accord, Kolender v. Lawson*, 461
> U.S. 352, 357 (1983); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).  Second,
> as a sort of "junior version of the vagueness doctrine," H. PACKER, THE LIMITS OF
> THE CRIMINAL SANCTION 95 (1968), the canon of strict construction of criminal
> statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a
> criminal statute as to apply it only to conduct clearly covered.  *See, e.g., Liparota*
> *v. United States*, 471 U.S. 419, 427, (1985); *United States v. Bass*, 404 U.S. 336,
> 347-348 (1971); *McBoyle, supra*, at 27.  Third, although clarity at the requisite level
> may be supplied by judicial gloss on an otherwise uncertain statute, *see, e.g., Bouie,*
> *supra*, at 357-359; *Kolender, supra*, at 355-356; *Lanzetta, supra*, at 455-457;
> JEFFRIES, LEGALITY, VAGUENESS, AND THE CONSTRUCTION OF PENAL STATUTES,
> 71 Va. L.Rev. 189, 207 (1985), due process bars courts from applying a novel
> construction of a criminal statute to conduct that neither the statute nor any prior
> judicial decision has fairly disclosed to be within its scope, *see, e.g., Marks v.*
> *United States*, 430 U.S. 188, 191-192 (1977); *Rabe v. Washington*, 405 U.S. 313
> (1972) (per curiam); *Bouie, supra*, at 353-354; *cf.* U.S. CONST., Art. I, § 9, cl. 3; *id.*,
> § 10, cl. 1; *Bouie, supra*, at 353-354 (Ex Post Facto Clauses bar legislatures from
> making substantive criminal offenses retroactive).  In each of these guises, the
> touchstone is whether the statute, either standing alone or as construed, made it
> reasonably clear at the relevant time that the defendant's conduct was criminal.

*United States v. Lanier*, 520 U.S. 259, 266 (1997).  The Supreme Court also repeatedly has made

clear that the "'rule of lenity only applies if, after considering text, structure, history, and purpose,

there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply

guess as to what Congress intended.'"  *Maracich v. Spears*. 570 U.S. 48, 76 (2013) (quoting *Barber*

*v. Thomas*, 560 U.S. 474, 488 (2010)).

In the instant case, the state court reasonably determined that the statute in issue does not suffer from a grievous ambiguity.  Instead, in the context of the statute's intent and the intent of the public health code as a whole, nothing in the language of the provision suggests the sort of narrow reading of the word "presence" that Petitioner would have this Court impose.  Like the court of appeals in the instant case, Michigan courts regularly have recognized that the rule of lenity does not apply when construing the public health code, "because the legislature mandated in [MICH. COMP. LAWS §] 333.111(2) that the code's provisions are to be 'liberally construed for the protection of the health, safety, and welfare of the people of this state.'"  *People v. Johnson*, 838 N.W.2d 889, 896 (Mich. Ct. App. 2013) (quoting *People v. Denio*, 564 N.W.2d 13, 17 (Mich. 1997) (rejecting application of the rule of lenity as applied to the public health code, specifically, MICH. COMP. LAWS § 333.7401(3)).  The nature of the risks posed by the manufacture of methamphetamine are such that manufacture within a home poses dangers to all members of the household, as recognized in multiple parts of the statute.  *See People v. Meshell*, 696 N.W.2d 754, 760-761 (Mich. Ct. App. 2005) (discussing the increased penalties under MICH. COMP. LAWS § 333.7401c(1)(a), for the manufacture of methamphetamine within 500 feet of a residence).  Similarly here, in the context of the risks involved, the statute demonstrates a legislative attempt to give a more expansive meaning to the word "presence" than that advocated by Petitioner.

For these reasons, the court of appeals' determination that the rule of lenity did not apply to the construction advocated by Petitioner was patently reasonable under clearly established Supreme Court precedent.

## V.    Ground III:  Prosecutorial Misconduct

Petitioner raises a variety of claims concerning the prosecutor's introduction of evidence and statements of fact and law during closing arguments.  In order for a petitioner to be

29

entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. at 103).

The Michigan Court of Appeals thoroughly addressed and rejected Petitioner's claims, both on procedural grounds and on plain-error review:

Defendant also raises several claims of prosecutorial misconduct. By failing to offer a timely and specific objection to any of the alleged instances of prosecutorial misconduct, defendant failed to preserve his claims for review. We review these unpreserved arguments for plain error. *Carines*, 460 Mich at 763-764. Claims of prosecutorial misconduct are reviewed case by case, with the prosecutor's remarks evaluated in the context of the entire record. *People v Dobek*, 274 Mich App 58, 64; 732 NW2d 546 (2007). Although a prosecutor may not argue facts not in evidence or misstate the law, the prosecutor is free to argue the evidence and all reasonable inferences. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995); *People v Abraham*, 256 Mich App 265, 275-276; 662 NW2d 836 (2003). Further, a prosecutorial misconduct claim may not be predicated on a prosecutor's good-faith effort to admit evidence. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999). Lastly, we cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect. *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003).

In this case, defendant argues that the prosecutor improperly introduced a series of irrelevant and prejudicial pieces of information at trial, including evidence that defendant's wife suspected he may have been using drugs and that she feared defendant because he was not himself during that time. Defendant also challenge[s] the prosecution's introduction of testimony from Deputy Wittkopp that defendant's wife had shared her concerns with police, and additionally told police that her son had purchased Sudafed for defendant and that she suspected defendant of manufacturing methamphetamine. Defendant also again challenges the introduction of evidence relating to his use of methamphetamine, including his own admissions and testimony from Lieutenant Rau regarding the characteristics of a methamphetamine user. But, on the facts of this case, this evidence was relevant and admissible. See MRE 402. Thus, the prosecution's good-faith introduction of this evidence did not constitute misconduct. *Noble*, 238 Mich App at 660. To the extent defendant's wife responded with hearsay when she testified that her son told her about the purchase of Sudafed for defendant, her hearsay reply was unresponsive, and not a basis for a finding of prosecutorial misconduct. See *People v Williams*, 114 Mich App 186, 199; 318 NW2d 671 (1982).

Defendant also argues the prosecutor argued facts not in evidence by indicating that the cloudy liquid in the water bottle could be used as a drink, which defendant now argues was its sole use, *or* for the purposes of making more methamphetamine. The prosecutor's argument, however, was a reasonable inference from Lieutenant Rau's testimony to the effect that the appearance of the water bottle and coffee filter was consistent the pseudoephedrine extraction phase of manufacturing methamphetamine. Accordingly, the prosecutor did not argue facts not in evidence when she stated that the water bottle could have been used for

two purposes.  See *Bahoda*, 448 Mich at 282.  Further, any prejudice was cured by the trial court's instruction that the lawyer's statements were not evidence.  See *Abraham*, 256 Mich App at 276.

Defendant also argues that the prosecutor misstated the law.  Specifically, defendant argues that the prosecutor incorrectly indicated during closing arguments that she needed only to prove that defendant knew that the chemical or laboratory equipment *could* be used to manufacture methamphetamine.  Even if the prosecutor's remarks did not exactly follow the statutory language of MCL 333.7401c(1)(b), any prejudice was alleviated by the trial court's proper instruction on the issue and its instruction to the effect that the jury must take their instructions on the law from the court, not the lawyers.  See *Abraham*, 256 Mich App at 276. Defendant also argues that the prosecutor misstated the law when she indicated that the presence of defendant's five-year-old daughter in the house was sufficient to show the presence of a minor.  However, the prosecutor's remarks coincided with the trial court's instruction which was, as discussed, a proper recitation of the law. Defendant has not shown plain error.

(Mich. Ct. App. Op., ECF No. 8-10, PageID.682-683 (footnote omitted).)

The court of appeals first concluded that Petitioner's prosecutorial-misconduct claims were unpreserved.  Although the claims likely are procedurally defaulted, *Magwood*, 561 U.S. at 340, the Court will skip the procedural-default question and decide the question on the merits.  *See Hudson*, 351 F.3d at 216 (citing *Lambrix*, 520 U.S. at 525).

Petitioner objects to the prosecutor's introduction of the following evidence: Petitioner's wife, Robin Wilcox, suspected Petitioner of using methamphetamine; Robin Wilcox told Deputy Wittkopp of her concerns; Robin told Wittkopp that Petitioner had solicited Jacob VanDyke to buy Sudafed; and Lieutenant Rau testified concerning the characteristics of a methamphetamine user.  As discussed in the court of appeals decision, however, the evidence was both admitted by the trial court and, according to the court of appeals, properly admitted under Michigan law.  Petitioner cannot demonstrate that the prosecutor committed misconduct by offering evidence that ultimately was admitted at trial.  "'A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings.'"

*See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009) (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008)); *see also Bales v. Bell*, 788 F.3d 568, 577 (6th Cir. 2015).

To the extent that Petitioner claims that the prosecutor misrepresented in closing arguments that the cloudy liquid in the water bottle could have been either a residual from the extraction phase of the methamphetamine process or a drink made to provide the user a boost, his argument is meritless. As the court of appeals held, Lieutenant Rau clearly testified to the possibility of both purposes. (*See* T. Tr. I, ECF No. 8-7, PageID.395.) The prosecutor therefore made no misrepresentation, and the court of appeals did not err in rejecting his claim, especially under the doubly deferential standard applicable on habeas review. *Parker*, 567 U.S. at 47.

Finally, the state court properly determined that Petitioner was not entitled to relief on the basis of the prosecutor's alleged misstatements of law during closing arguments. Even if, as the court of appeals held, the prosecutor misstated the law by arguing that she only needed to prove that Petitioner knew that the chemicals and equipment could be used for methamphetamine manufacture, that error falls short of demonstrating prosecutorial misconduct. The comment was isolated. *Young*, 470 U.S. at 11-12. In addition, the trial court properly instructed the jury on what it must find to prove each of the offenses. (T. Tr. II, ECF No. 8-8, PageID.644.) The court also properly instructed the jury that if they heard any conflict between the law as stated by the attorneys and the court, they must follow the court's statement of the law. (*Id.*, PageID.634.) Under these circumstances, especially in light of the double deference owed on habeas review, the court of appeals properly rejected Petitioner's claim of prosecutorial misconduct. *Young*, 470 U.S. at 11-12.

VI.   <u>Ground IV: Defective Complaint and Lack of District Court Jurisdiction</u>

Petitioner argues in his fourth habeas ground that the district court lacked jurisdiction to conduct its preliminary examination and bind him over for trial because the criminal complaint lacked sufficient facts to support the issuance of a warrant based on probable cause. The claim was raised for the first time in Petitioner's pro per supplemental brief on appeal to the Michigan Court of Appeals. The court of appeals summarily rejected Petitioner's claim as follows:

> [D]efendant . . . asserts that the felony complaint's conclusory assertions did not provide probable cause for an arrest, and that, as a result, the lower court lacked jurisdiction. Even if the complaint failed to provide details for the basis of the allegations contained therein, any such deficiency did not deprive the trial court of jurisdiction, and defendant is, therefore, not entitled to relief. *People v Burrill*, 391 Mich 124, 133; 214 NW2d 823 (1974); see also *Frisbie v Collins*, 342 US 519, 522; 72 S Ct 509; 96 L Ed 541 (1952).

(Mich. Ct. App. Op., ECF No. 8-10, PageID.683.)

The decision of the court of appeals is patently correct. Even if there were some flaw in the complaint and warrant process, Petitioner would not be entitled to habeas relief. *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (illegal arrest or detention does not void a subsequent conviction). The method by which Petitioner's presence was procured at trial does not provide a basis for invalidating his criminal conviction. *See Immigration & Naturalization Service v. Lopez–Mendoza*, 468 U.S. 1032, 1039 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."); *Frisbee v. Collins*, 342 U.S. 519, 522 (1952); *Ker v. Illinios*, 119 U.S. 436, 444 (1886); *Browning v. Jabe*, No. 88-1307, 1990 WL 6943, at * 1 (6th Cir. Feb. 1, 1990) ("petitioner's arguments that his arrest was absent probable cause . . . [are] irrelevant, as an unlawful arrest is not a defense to a valid conviction.") (citing *United States v. Crews*, 445 U.S. 463, 474 (1980)). As a result, Petitioner is not entitled to relief on his fourth habeas ground.

34

VII.    <u>Ground VI: Denial of Fair Trial by Nonresponsive Answer</u>

Petitioner contends that Lieutenant Rau gave a nonresponsive answer to the prosecutor's question, indicating that a search warrant had been issued against Petitioner, ostensibly on an unrelated matter.    Specifically, Petitioner complains about the following exchange:

Q    Okay. And can you I guess--well let me say this.  Back on November 14th, were you part of a team in 2011 that investigated a possible Meth at 55 North Amy School Road in Pierson Township, Montcalm County?

A    Yes, I was.

Q    And were you one of the initial responders?

A    Initially, two of the officers that work for me, Deputy Don Wittkopp and Officer Jason Coon I believe responded to the house.  And then I was then requested a short time later.

Q    Okay.  And so the reason you got called there was why?

A    Initially, the call was to search for Mr. Wilcox who had a valid warrant out. And then at some point there was some chemical smells identified and possible components involved in Meth lab.

(T. Tr. I, ECF No. 8-7, PageID.383-384.)  Petitioner complains that evidence of an outstanding warrant for his arrest amounted to impermissible evidence of other bad acts, resulting in the denial of a fair trial.

As previously discussed, there is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  *See Estelle*, 502 U.S. at 75 n.5; *Bugh*, 329 F.3d at 512.  As a consequence, no constitutional error occurred when Lieutenant Rau mentioned the existence of a warrant.

Moreover, even if the admission of Rau's statement could be deemed to rise to the level of constitutional error, it would be considered harmless under the circumstances of this case.

35

Before granting habeas relief on a non-structural error, a court must consider whether trial error is harmless under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness.  *See Hargrave*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Fry v. Pliler*, 551 U.S. 112, 120-21 (2007)); *see also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007).  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.  In determining whether an error was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684) (1986).

Here, the reference to an arrest warrant was made in passing, and substantial other evidence supported Petitioner's conviction on the charged offenses.  In addition, the trial court expressly instructed the jury on its consideration of evidence of other bad acts:

> You've heard testimony from a witness to show that the defendant has engaged in other acts for which the defendant is not on trial.  If you believe this evidence, you must be very careful to consider it only for the limited purpose to show intent, motive, common system, plan or scheme, or absence [of] a mistake or accident regarding the act for which the defendant . . . is now on trial.  You must not consider this evidence for any other purpose.  For example, you must not decide that it shows that the defendant is a bad person or that the defendant is likely to commit crimes.  You must not convict the defendant here because you think he is guilty of other bad conduct.

(T. Tr. II, ECF No. 8-8, PageID.642-643.)  In light of the limited scope of Rau's statement, the proofs at trial, and the cautionary instruction issued by the court, any error in admission was harmless.

36

VIII.    Ground V:  Ineffective Assistance of Counsel

In his fifth habeas ground, Petitioner complains about numerous alleged actions by counsel that Petitioner asserts amounted to ineffective assistance of counsel.  He argues that trial counsel failed to object to Detective Wittkopp's "editorializations" about what Petitioner said in his interview.  Petitioner also claims that trial counsel failed to object to prejudicial other bad acts evidence, specifically, the mention of Petitioner being the subject of an arrest warrant.  In addition, Petitioner argues that trial counsel failed to object to an improper jury instruction on the elements of both offenses.  Further, he contends, counsel failed to object to the prosecutor's alleged misstatement of the elements during closing arguments.  Finally, Petitioner asserts, trial counsel was ineffective in failing to move for a mistrial on the ground that the verdict was against the great weight of the evidence.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the

37

wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals addressed Petitioner's claims of ineffective assistance of counsel in great detail:

> Also in his Standard 4 brief, defendant maintains he was deprived of the effective assistance of counsel. A claim of ineffective assistance of counsel presents a mixed questions of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Because defendant's claims are unpreserved, our review is limited to mistakes apparent on the record. *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002). To establish ineffective assistance of counsel, a defendant must "show that his attorney's representation fell below an objective standard of reasonableness and that this was so prejudicial to him that he was denied fair trial." *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). To show prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 302-303 (citation omitted). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

Defendant first contends that counsel should have objected to Deputy Wittkopp's testimony regarding his statement because it was inadmissible insofar as it involved an "editorialized" version of defendant's statement to police.  In making his argument, defendant relies on *People v McGillen*, 392 Mich 251, 263; 220 NW2d 677 (1974), wherein the Court indicated that a police officer's "editorialized version" of a statement may not be admitted against a defendant.  However, defendant misapplies *McGillen*, which in substance held the paraphrased statements at issue inadmissible because there had been a *Miranda* violation.  We have since explained that the editorialized nature of the officer's testimony in *McGillen* went only to the question of his credibility, and we have rejected the notion that statements are inadmissible where they involve a paraphrased, rather than an exact, account.  See *People v Eccles*, 141 Mich App 523, 524-525; 367 NW2d 355 (1984).  Accordingly, in this case, any objection by counsel on these grounds would have been futile, and counsel will not be held ineffective for failing to making a futile objection.  *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).  Further, given the substantial evidence of defendant's guilt, defendant has not shown a reasonable probability of a different result.  *Toma*, 462 Mich at 302-303.

Defendant also maintains counsel was ineffective for failing to file a motion in limine or to object to testimony from Lieutenant Rau that there was a valid search warrant for defendant's arrest.  The testimony at issue was offered in relation to Lieutenant Rau's explanation of how police came to be at the house, and it did not indicate the nature of the offense for which the warrant had been issued.  On these facts, defendant has not overcome the presumption that the decision not to object was a matter of trial strategy, designed not to draw the jury's attention to the information.  See *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008).  In addition, defendant fails to provide any legal support for the proposition that defense counsel was ineffective for failing to file a motion in limine in circumstances such as these, where there was no indication that the challenged information would be testified to at trial.  Defendant thus fails to show that defense counsel's representation fell below an objective standard of reasonableness.  *Toma*, 462 Mich at 302-303.  Moreover, there was significant evidence supporting defendant's convictions and defendant has failed to show a reasonable probability that, but for defense counsel's failure to object to Lieutenant Rau's testimony, the result of the proceeding would have been different.  *Id.*

Defendant also challenges defense counsel's failure to object to the trial court's instructions on the elements of the offense.  In particular, defendant notes that in relation to both of defendant's convictions, the trial included a superfluous reference to "was to be used," stating "defendant did own or possess any chemical or laboratory equipment that he knew or had reason to know *was to be used* or *was to be used* for the purpose of manufacturing Methamphetamine."  The second reference to "was to be used" may have been potentially confusing if the instruction were read in isolation.  However, read as a whole, the jury instructions clearly instructed the jury of defendant's charges, including a proper recitation of the

requirement that he own or possess "chemical or laboratory equipment that he knew or had reason to know was to be used to manufacture Methamphetamine." In these circumstances, even if imperfect, the extra reference to "was to be used" did not rise to the level of error as, on the whole, the instructions fairly presented the issues. *Kowalski*, 489 Mich at 501-502. Thus, counsel's decision not to object did not fall below an objective level of reasonableness. Moreover, the verdict form is considered part of the jury instructions and, in this case, the verdict form appropriately listed the details of the offenses, thereby mitigating any prejudice. See *Eisen*, 296 Mich App at 330-331. Given the significant evidence of defendant's guilt and the appropriate language on the verdict form, defendant has also not shown that, but for counsel's failure to object, there was a reasonable probability of a different outcome. *Id.* On this record, defendant has not shown the ineffective assistance of counsel. *Toma*, 462 Mich at 302-303.

Defendant also contends that counsel performed ineffectively by failing to move for a new trial based on the assertion that the verdict was against the great weight of the evidence. The test to determine whether a verdict is against the great weight of the evidence is whether "the evidence preponderates heavily against the verdict so that it would be a serious miscarriage of justice to allow the verdict to stand." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998). Considering the record and the substantial evidence of defendant's guilt, a motion for a new trial on this basis would have been futile, and counsel is not ineffective for failing to make a futile motion. See *People v Brown*, 279 Mich App 116, 142; 755 NW2d 664 (2008).

(Mich. Ct. App. Op., ECF No. 8-10, PageID.683-685 (footnotes omitted)). Although the court of appeals did not cite *Strickland*, it unquestionably applied the *Strickland* standard for evaluating claims of ineffective assistance of counsel. Not only did the recited standard track *Strickland*, but also the court of appeals relied on *People v. Toma*, 613 N.W.2d 694 (Mich. 2000), in which the Michigan Supreme Court expressly cited *Strickland*. *Toma*, 613 N.W.2d at 703.

In addition, the court of appeals properly applied the *Strickland* standard to Petitioner's claims of ineffective assistance of trial counsel. With respect to Petitioner's argument that counsel should have objected to Deputy Wittkopp's "editorialized" testimony about Petitioner's statement, the court of appeals concluded that Wittkopp's testimony was properly admitted under Michigan law. As the Court previously discussed, the decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright*, 464 U.S. at 84; *Stumpf*, 722

40

F.3d at 746 n.6 (quoting *Bradshaw*, 546 U.S. at 76). As a result, any objection would have been futile. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

With respect to Petitioner's claim that counsel was ineffective in failing to object Lieutenant Rau's mention of the existence of a warrant for Petitioner's arrest, Petitioner fails to meet either prong of the *Strickland* standard. The Michigan Court of Appeals determined that counsel had failed to meet the objective prong of *Strickland*, because he failed to overcome the presumption that trial counsel elected not to object as a matter of trial strategy, in order to avoid highlighting the issue for the jury. That determination was objectively reasonable under the circumstances, especially given that counsel was aware that the trial court intended to give – at defense counsel's request — a limiting instruction on the use of evidence of other bad acts. (*See* 10/11/12 Mot. Hr'g Tr., ECF No. 8-4, PageID.216-220.) Moreover, as the Court discussed in addressing Petitioner's sixth habeas ground, given the limited scope of Rau's statement, the proofs at trial, and the careful cautionary instruction issued by the court with respect to evidence of other bad acts, Petitioner cannot demonstrate that he was prejudiced by the lack of objection. *Strickland*, 466 U.S. at 689.

Petitioner's claim that counsel was ineffective in failing to object to the jury instructions on the elements of the offenses fails because the court of appeals concluded that the jury instructions were proper. As the Court discussed in addressing Petitioner's second ground for habeas relief, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review unless the erroneous instruction so infected the entire trial that the resulting conviction

violates due process.  *Henderson*, 431 U.S. 145, 155 (1977); *Estelle*, 502 U.S. at 75; *Rashad*, 675 F.3d at 569.  Given that the court of appeals approved the jury instructions under state law, and given that this Court previously found that Petitioner had failed to identify a constitutionally improper jury instruction, Petitioner cannot demonstrate that a reasonable attorney would have objected to the instruction or that any objection would have been effective.  He therefore cannot demonstrate either prong of the *Strickland* standard.

Next, Petitioner claims that his trial attorney was ineffective in failing to object to the prosecutor's misstatement of the law during closing arguments.  As I earlier discussed, any error in the prosecutor's statement of the law was isolated, and the jury was instructed to follow the court's recitation of the law, rather than any divergent statement of the law provided by an attorney.  Therefore, Petitioner cannot demonstrate that he was prejudiced by defense counsel's failure to object.

Finally, Petitioner contends that his attorney rendered ineffective assistance when he failed to move for a new trial on the ground that the verdict was against the great weight of the evidence.  The Michigan courts apply the great-weight-of-the-evidence standard to determine whether to grant a new trial.  *See People v. Lemmon*, 576 N.W.2d 129, 137 (Mich. 1998).  This question is distinct from the due-process guarantee offended by insufficient evidence and "does not implicate issues of a constitutional magnitude."  *Id.* at 133 n.8.  As a consequence, a "weight of the evidence claim" is purely a matter of state law and is not cognizable on habeas review.  *See* 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with federal law that renders a state's criminal judgment susceptible to a collateral attack in the federal courts."); *Estelle*, 502 U.S. at 68.

As the court of appeals concluded, because the record contained substantial evidence of guilt, any motion for a new trial would have been futile.  That determination is binding on this court.  An attorney is not obliged to file a futile motion.  *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506.

For all these reasons, Petitioner cannot overcome the double deference owed to the Michigan Court of Appeals' resolution of his claims of ineffective assistance of counsel.  His fifth habeas ground therefore should be denied.

### Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken.  28 U.S.C. § 2253(c)(1).  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated:  March 5, 2018                               /s/ Ray Kent
                                                    United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).